8

Otto Kretschmar and Bruno Kretschmar, Plaintiffs, Appellees, v. Goven, Eddins and Company and Julius I. Mandel, Defendants, Appellants. Louis Rix et al., Defendants, Appellees.

Goven, Eddins and Company, Counter Claimants, Appellants, v. Julius I. Mandel et al., Defendants, Appellees. Otto Kretschmar and Bruno Kretschmar, Plaintiffs, Appellees.

Julius I. Mandel, Counter Claimant, Appellant, v. Goven, Eddins and Company, Defendants, Appellees. Otto Kretschmar and Bruno Kretschmar, Plaintiffs, Appellees.

Gen. No. 40,335.

Original opinion filed April 26, 1939.
Rehearing opinion filed June 21, 1939.

BEN COPPLE, of Chicago, for certain appellant.

SWANSON & DODGE, of Chicago, for certain other appellant; BEN COPPLE and EUGENE DORNBAUGH, of Chicago, of counsel.

HARRY A. BIOSSAT, of Chicago, for appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

On February 8, 1937, plaintiffs filea their amended complaint in chancery to recover possession of certificates of deposit and mortgage bond certificates of beneficial interest in real estate, which they asserted were delivered to defendants as agents for plaintiffs for the purpose of transfer and not for sale. Defendant corporation filed an answer and counterclaim. It admitted possession of certain of the securities, declaring that it purchased them from the defendant Julius I. Mandel for a valuable consideration without notice of claims of plaintiffs. It prayed that it be decreed to be the owners of the securities. Defendant Mandel filed an answer and counterclaim in which he said he purchased certain of the securities for a valuable consideration from one Louis Rix, and that he did not have notice of the rights of the plaintiffs. The case was referred to a master, who reported in favor of plaintiffs' contentions. Objections before the master were allowed to stand as exceptions. The exceptions were overruled and a decree entered finding that the plaintiffs were the owners of the securities and that the defendants were not bona fide purchasers thereof. From the decree, the corporation and the individual, Julius I. Mandel, prosecute this appeal.

Plaintiffs are residents of North Dakota. They owned certain certificates of deposit and certificates of beneficial interest. Since the depression, it has been the custom in Chicago that when bonds secured by trust deeds on real estate went into default, bondholders protective committees were organized and they requested the holders of the bonds to deposit their bonds with the depositaries. Receipts were thereupon issued to the bondholders, indicating that the bonds had been deposited. When the property has been reorganized through foreclosure proceedings, title is generally taken in the name of an individual who is the trustee for the depositing bondholders, or in the name of a corporation. When the title is taken in the name of a corporation, stock certificates are issued to the depositing bondholders. When the title is taken in the name of a trustee, certificates of beneficial interest are issued to the depositing bondholders. Sometimes, a voting trust for corporate stock is also set up. The certificates owned by plaintiffs are printed in the usual form and are similar to stock certificates. Both parties cite section 7 of the Uniform Stock Transfer Act (sec. 422, ch. 32, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 32.201]), which reads as follows:

"If the indorsement or delivery of a certificate

"(a) was procured by fraud or duress, or

"(b) was made under such mistake as to make the indorsement or delivery inequitable; or

"If the delivery of a certificate was made

"(c) without authority from the owner, or

"(d) after the owner's death or legal incapacity, the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless:

"(1) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful, or

"(2) The injured person has elected to waive the injury, or has been guilty of laches in endeavoring to enforce his rights.

"Any court of appropriate jurisdiction may enforce specifically such right to reclaim the possession of the certificate or to rescind the transfer thereof and, pending litigation, may enjoin the further transfer of the certificate or impound it." Defendants cite section 11 of the same act (sec. 426, ch. 32, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 32.205]), which reads as follows:

"A person who for value transfers a certificate, including one who assigns for value a claim secured by a certificate, unless a contrary intention appears, warrants—

"(a) That the certificate is genuine.

"(b) That he has a legal right to transfer it, and

"(c) That he has no knowledge of any fact which would impair the validity of the certificate.

"In the case of an assignment of a claim secured by a certificate, the liability of the assignor upon such warranty shall not exceed the amount of the claim."

Defendant Julius I. Mandel is a physician with offices at 4803 Lincoln avenue, Chicago. That district is known as Lincoln Square. Goven, Eddins & Company is a corporation engaged in the investment securities business with offices at 11 South La Salle street, Chicago. It bought and sold certificates of deposit and certificates of beneficial interest. It was stipulated that on or about September 2, 1936, plaintiffs were the owners of certain certificates of beneficial interest and certificates of deposit; that on the reverse side thereof the certificates bore assignment forms; that plaintiffs signed the assignment blanks without filling in the name of the assignee and delivered the certificates so assigned to "Frank Clayton or to some other person." It was further stipulated that the delivery to said defendant Frank Clayton or the said other party was only for the purpose of transferring said certificates, and that the said defendant or the said other person was not authorized in any way by either of the plaintiffs to make any sale of same to any other person. The stipu-

lation applied only to the certificates of deposit and of beneficial interest received in evidence.

An assistant secretary of the Chicago Title & Trust Company testified that no Frank Clayton was ever employed by that concern, and that the form of receipt shown to him, the witness, was not used by the Chicago Title & Trust Company. An attorney for the Chicago Title & Trust Company testified that the card and receipt last mentioned were received by mail from the "plaintiff in this case." The receipt purports to be an official receipt by the Chicago Title & Trust Company, per Frank Clayton, and the printed card reads: "Frank Clayton, Chicago Title & Trust Company, 60 West Washington Street, Chicago." Plaintiffs did not testify. Except for the statement that the receipt and card were received in a letter, there is nothing to show the materiality of these two exhibits. We presume the inference that the court was expected to draw from the exhibits was that the person who obtained the securities from plaintiffs, used faked documents in order to impose on plaintiffs. There is nothing in the record which would justify that inference. A reasonable inference, however, is that plaintiffs dealt with a swindler who gave his name as Frank Clayton. It may be that the person who gave his name as Frank Clayton was the same person hereafter referred to as Louis Rix. The admission of the fictitious card and receipt, however, was harmless, as the record otherwise clearly shows that plaintiffs delivered the securities because of a fraud perpetrated on them. It is stipulated that the securities were delivered for the purpose of being transferred, and that the person to whom they were delivered was not authorized to sell.

Defendant Julius I. Mandel testified that Louis Rix had been a patient of his for about 15 years, and that his last known address was the Sheridan Plaza Hotel in Chicago; that he also treated Sarah Rix, the wife of Louis Rix, on several occasions, and that Sarah Rix

lived around 700 York Place in Chicago; that they had one child; that he called on them many times and had a record of the calls. He stated that he received the certificates from Louis Rix around September 1, 1936; that Rix said to him: "I owe you some money, if you will buy these certificates I need $750 cash. I have got to have money right away. I will sell you these certificates and you can sell them and what you get over, above and outside of $750 will be yours." Witness stated that he had the certificates at that time; that he looked at them and saw what name they were made out to and that they were properly indorsed; that he did not know where he got them, and that he did not ask him how he got them; that he didn't ask anything about what the certificates were except just what he saw, and that he told him he would let him have $750. Witness further testified as follows:

"I didn't know anything about the securities when I was talking to him. I called up Goven, Eddins and found out at the same time. I had transactions with Goven, Eddins & Company before that. I do not know how long, several years perhaps off and on. I never saw these certificates before Mr. Rix produced them. I never had any transactions with these certificates. At that time I gave Mr. Rix some cash—the difference between $644 and $750. Something like $106. I took $106 out of my pocket. I did not know he was coming in at that time." Witness further stated that Rix did not give him a receipt for the money; that he gave Rix a receipt in full for the amount of money Rix owed him for services as a physician; that Mandel did not ask Rix where he got the certificates, and he did not make any investigation to ascertain where they came from. Mandel stated that he tried to locate Rix at the Plaza Hotel, but that he was not there, nor could he locate Mrs. Rix. He stated that he had had other transactions with the security house, that the other transactions were some time previous, "perhaps a year or two or

three"; that he did not remember the kind of securities involved in the other transaction. At another time, Mandel testified that he called the security house after he agreed to pay Rix $750; that he sent the securities downtown by messenger, and that Rix waited in his office until the check was brought back. The check in the sum of $644.94 was made out to "Julius I. Mandell." The check was indorsed by him and cashed by the Lincoln Square Realty & Investment Company, who operate a currency exchange in the building where he had his office. Mandel stated that he had not seen Rix since he turned over the cash to him.

In response to a subpoena, Dr. Mandel brought in his book of accounts, which was in loose leaf form. He testified that he wrote part of it and that "the girl wrote the balance." He stated that the entries were made at the time of the transactions. The book was taken by the attorneys for plaintiffs for the purpose of having photostatic copies made. Recalled for cross-examination, Mandel testified that in May, 1936, he sold to Goven, Eddins & Company the securities on the Irving and Mayflower Hotels. He stated that the securities were given to him by Rix, and that in that transaction he acted as the agent for Rix. Obviously, the securities sold by Mandel in May, 1936, could not have been any of the securities out of which plaintiffs were swindled in September, 1936. Mandel stated that for the securities sold by him as agent, he received a check and turned part of the proceeds over to Louis Rix; that he kept $50 on account of his bill and $100 that he had loaned Rix two days before. As to the securities disposed of in May, Mandel stated that Rix came to him one night and said he was leaving town and needed $100, and that he had some securities in his pocket which he wanted Mandel to dispose of while he was away; that when he returned he was to return to Mandel the $100 he had advanced Rix and $50 to apply on his bill, which Rix did, and that Mandel gave Rix $100

and he gave Mandel the bonds. Witness stated that Rix told him to dispose of the securities through Goven, Eddins & Company, and that the witness did not have any prior transactions with that security house.

Karl E. Hultenschmidt testified that he had been a clerk at the Sheridan Plaza Hotel from July 26, 1936; that he examined the records of the hotel for August and September, 1936, and that he did not find any registration of Louis Rix; that he did not know Louis Rix and had never heard his name, and that he did not recall that he ever registered at the hotel.

Charles E. Mitchell of the Lincoln Square Realty & Investment Company testified that he knew Dr. Mandel for five years; that he cashed a check for Dr. Mandel on September 4, 1936, and delivered the cash to him.

Alexander E. Rix testified that he was secretary of the Lincoln Square Realty & Investment Company; that he knew Dr. Mandel for four years; that he never went by the name of Louis Rix and that he had a brother named Louis Rix who resides in Emporia, Kansas.

Louis A. Rix testified that he had a wife named Catherine; that he never had any transactions with Dr. Mandel, and that he never lived at the Sheridan Plaza Hotel or on York place, and that he was never a patient of Dr. Mandel.

The testimony of the last two witnesses is of a negative character and does not aid in the decision of the case. At most, it will only give rise to speculation that because of hearing the name Rix, the thought came into Dr. Mandel's mind to use that name. Such inference is not warranted by the record and will be disregarded.

John R. Eddins testified that he was the vice president and treasurer of Goven, Eddins & Company. He identified the check issued on September 4, 1936. He stated that prior to issuing the check he had a conversation with Dr. Mandel on the telephone and that Dr. Mandel sold him some certificates of deposit for

McCarthy Fireproof Warehouse and some certificates of beneficial interest in the Park Shore Properties Liquidation Trust. Attached to each certificate offered in evidence is an authorization in blank for the transfer of securities. The authorization concludes with the words: ''In releasing the securities as above described, you may consider this letter your authority for transferring them from my name, and furthermore, that you will in no wise be held responsible for their return to me.'' The authorization blanks are signed by plaintiffs according to their interest. The purchase price for the two securities sold on September 4, 1936, was $450 for the McCarthy Fireproof Warehouse and $194.94 for the Park Shore. Witness stated that he directed a young lady in the office to make out the check; that he had a record of a prior transaction with Dr. Mandel on May 28, 1936, when he purchased from Dr. Mandel the Mayflower first mortgage certificates and Irving Hotel certificates. On being recalled, witness testified that the three additional securities involved herein were received on September 5, 1936, and that Dr. Mandel sent them down by messenger; that no payment was made for the last three securities. The last three securities are indorsed by plaintiffs in blank and are accompanied by an authorization similar to the one heretofore mentioned. Here it is interesting to observe that two securities were delivered and the check turned over to Dr. Mandel on September 4, 1936, and three securities were delivered to the security house on September 5, 1936. Eddins further testified that in the afternoon of September 4, 1936, he had a call from the Lincoln Square Realty & Investment Company, and that he was asked if he had issued a check to Dr. Mandel, and he stated that he had. Witness stated that the following morning Dr. Mandel called and stated that he had some more securities, naming them, and asked what price would be paid for them; that when the messenger arrived on September 5, 1936, with the securities, he

called up the Chicago Title & Trust Company and asked if any "stop transfers" were against them; that he was informed that "stop transfers" had been filed that morning against the five securities; that he gave Dr. Mandel a receipt for the three securities delivered and called the bank and asked them to stop payment on the check issued the day before to Dr. Mandel, and that subsequently the check was paid. It is manifest that Goven, Eddins & Company was required to pay the check, as the Lincoln Square Realty & Investment Company was an innocent holder in due course. Witness stated that he had had dealings with Dr. Mandel in May, 1936, and that they had been satisfactory. He stated that he had never heard of Frank Clayton or Louis Rix, and that he was the only one connected with his corporation that had any dealings with Dr. Mandel; that he did not know who any of the former owners were except the plaintiffs, and that he did not know that some of the former deliveries or trades were for a limited purpose; that he had been in that business for 23 years; that the corporation had been in business seven years and that their principal business was dealing in certificates of deposit for real estate bonds; that they had transactions every day; that he is familiar with the usage and customs of dealers of securities of that type; that it is the custom of dealers in securities of that type where the securities are indorsed in blank, to have them transferred on the books of the transfer agent only after they are sold and that it is not possible to tell how many times a certificate in blank has been transferred. On cross-examination, witness stated that when the securities arrived, he examined them; that he did not ask Dr. Mandel anything concerning the certificates other than to identify the same, and that he did not ask Dr. Mandel how he acquired them. Witness stated that it is not the custom to have them transferred until they are finally sold to someone who wants to own them. He stated the only previous dealings he

had with Dr. Mandel were satisfactory; that during their seven years of business, Goven, Eddins & Company had purchased thousands of certificates and that all certificates purchased during that time were either indorsed in blank or the accompanying power to transfer was indorsed in blank; that on receipt of certificates from people that they did not know, it was customary to require that the signature be guaranteed. He stated he had known Dr. Mandel for 14 years, and that "when I purchased those certificates from a man I deal with in business and my past relationship had been satisfactory, I would not require a guarantee of signature."

The attorney for plaintiff testified that the account book he took from the court room was turned over to Vernon Faxon. The latter testified that he is an examiner of questioned documents, commonly referred to as a handwriting expert, and that he has been in that business over 20 years and maintains a complete laboratory for such work. His qualifications were admitted. The point is made here that his testimony should be excluded because the book was not introduced in evidence. Our examination of the record satisfies us that in view of the actions of the parties, the introduction of the book was excused. When the book was offered in evidence by plaintiffs, defendants' counsel objected because it was not material and that putting the book in evidence would interfere with the doctor's business. Counsel proposed that a photostatic copy be made. The proposal was accepted by attorney for plaintiffs, who agreed to have photostatic copies made in three days so that the book could be returned. Witness stated that he examined the book and the account of Louis Rix, and that he formed the opinion that three people made most of the entries; that he examined every account in the book and that three different people made entries excluding the Louis Rix account; that "the Louis Rix account was the only account opened

in the book by the person who opened the book," and that there were several other accounts opened on the same day, February 2, 1936. Hence, it appears that the book purported to show that the Louis Rix account was opened on February 2, 1936. Witness further testified as follows: "The Rix account was not made by the same person who made the other entries on that same date. It was the only account in the book that contained the handwriting of the person who opened the Rix account. All other entries made on that date, the 2nd of February, were written in the same handwriting with this one exception. I went clear through the book and that page was the only one on which I found the handwriting of that person. I examined the paper of the book and found that the first entries, along in 1928, 1930 and 1931 I think it was, were written on 'watermarked Hammermill Bond ledger paper.' Then, 1930, 1931 and up to 1936, including the fore part of 1936, it was on 'De Luxe ledger paper,' which continued to August, 1936. Then, in September, 1936, all the pages were Hammermill but of a different mark. The main difference was 'made in U. S. A.,' printed in the upper left hand corner. This did not appear on the old Hammermill. This paper did not appear in the ledger prior to September, 1936, with the exception of the Rix account, which was on that Hammermill paper that did not appear in the ledger prior to September, 1936. I went through every account in that ledger. All entries prior to September, 1936, were on this De Luxe paper with the exception of two or three accounts which were on the Hammermill, which I mentioned. All entries subsequent to September, 1936, were on this Hammermill 'made in U. S. A.' There is no similarity in the new and old paper. This 'made in U. S. A.' was put out during the NRA in about 1932 or somewhere along there. From this examination I formed a very general opinion as to when the entries in the Louis Rix account were made." Over objection witness

stated that "In my opinion, although the first entry is dated February 2, 1936, it was not physically opened in the ledger until after August, 1936. I cannot say how long afterwards but I am positive it was not made until after August and it was not opened on the date that it purports to have been opened."

Defendants argue that the opinion of the witness last quoted was not admissible, as invading the province of the court. Disregarding the quoted opinion, there was sufficient in the testimony to justify the chancellor in concluding that the sheet in the account book showing an account opened by Louis Rix on February 2, 1936, was not in fact written and inserted in the book until August, 1936, or later.

Herman Wollenberger testified that he is an investment broker and president of Wollenberger & Company, which concern is mentioned in some of the certificates; that on the Friday before Labor Day in 1936, he saw the certificates which were introduced in evidence by plaintiffs, and that they were then in the possession of a man who said his name was "Louis Bix." On cross-examination he stated that the man did not spell his name and that "it might have been Rix."

Emmit F. Morrison, on behalf of plaintiffs, testified that he is employed by A. R. Frank & Company, brokers; that he is familiar with the custom in the brokerage business about receiving certificates indorsed in blank. He stated that "Our custom is that if securities are delivered by an individual for his account or in his name, we accept it for his credit or for payment, but if the securities are for another's account, not in the name of the individual, if they are sold, we make the check payable the way the certificate reads and not for the party who sold it. That is the custom of A. R. Frank & Co. I would say that is the custom among brokers in general although I only worked for one firm. The custom among brokers generally is the custom I have given. If the stock certificate is endorsed

in blank and we don't know that person or his signature, and if there is a witness and we don't know his signature, and if the certificate is presented by a person other than the witness, or other than the person to whom the certificate is made, we would require the signature be guaranteed. We would not guarantee the signature if we did not know the person. It would not make any difference if it was accompanied by a blank in the form of Plaintiff's Exhibit 2-A of January 26, 1937.'' On cross-examination, he stated that the concern with which he was connected is a New York stock exchange house and that they do not deal in certificates on real estate bonds. He stated, however, that they have had transactions involving certificates of deposit for bonds.

W. M. Herbster testified for plaintiff and stated that he did not know whether there was a custom in Chicago, but that there is a custom in his firm. In answer to a hypothetical question, he stated that if a customer that he had known for 14 years and with whom he had previous satisfactory dealings, brought in securities accompanied by a letter of transmittal, the customer not being named in the securities and the securities being indorsed in blank, that he would not pay the customer but would make the check out to the party named in the certificate.

Frank J. Kelly testified that he is a cashier for a concern doing a brokerage business and also dealing in general and unlisted securities. He stated that ''If a certificate of beneficial interest or stock certificate is endorsed in blank and is brought in by a customer and I do not know the person to whom it is made out, and I do not know his signature nor the name of the witness other than that which is appended, I would have to know the party who brought it in. I would then sell it for his account if he had any kind of a letter of identification. If I did not know the person in the certificates or his signature, or the signature of the witness, the

check would be made out to the party mentioned in the certificate unless we knew the party who brought it in and had a letter of authorization to pay it, with reference to that particular certificate.'' On cross-examination, he stated that if they knew the customer that brought in the securities and had had satisfactory dealings with him in the past and he produced certificates in blank with a letter such as accompanies the certificates in evidence, ordinarily the certificates would be accepted.

John W. Bissell, on behalf of defendant corporation, testified that he is president of a concern dealing in unlisted securities, particularly real estate, stating that securities of that type are generally assigned in blank when bought by a dealer or broker; that when the dealer buys such securities, he generally has them transferred to himself or to a nominee, and that when he sells them he delivers them in blank. In answer to a hypothetical question, he stated that there was no custom in Chicago among dealers of real estate securities with reference to the acceptance of certificates indorsed similar to the ones in evidence.

Walter Leahy testified that he has been in the unlisted brokerage business for eight years and deals primarily in real estate securities; that they deal in about $100,000 worth of real estate securities per month; that he is familiar with the customs, usages and rules with reference to the purchase and sale of securities of this type in Chicago; that such securities are ordinarily assigned in blank when purchased by a broker or dealer; that they carry them in blank and deliver them in blank when they are resold. In answer to a hypothetical question, he stated that there is a custom to accept such securities indorsed in blank without requiring the signature to be guaranteed. On cross-examination, he stated that ''If I had a previous deal with someone and he called me for a price on other securities and after giving the price he sent his messenger with the securities, which were not in the

name of the person I talked to, and he did not come in himself and no further conversation was had, I would issue a check payable to the person I talked to without inquiring as to how he obtained them, or about the endorsement, or the witness, or the financial responsibility of the person to whom I talked.'' He stated on cross-examination that if the man were a professional man whom he had known for 14 years, he would make the deal.

It is manifest that the certificates were procured through fraud by Clayton or some other person. The question arises as to whether the certificates were transferred for value in good faith without notice of any facts making the transfer wrongful. We shall first consider the evidence as it applies to Dr. Mandel. He is not a broker or a dealer in securities. He is a physician. He testified that he had prior transactions with the security house, one, two or three years before, and that he then did not know what kind of securities were involved. It was established that the prior transaction consisted of the sale of two securities on May 28, 1936. He later admitted that in that transaction, he acted as agent for Louis Rix. The period of time elapsing between the two transactions was only three months and one week. The chancellor had a right to conclude that the witness would not forget a transaction which was out of the line of his profession, and to consider that circumstance in determining his credibility. When the witness was required to bring in the account book, which was of the loose leaf type, it was taken to the handwriting expert who carefully examined it. Dr. Mandel stated that all the entries in the account book were made approximately at the time of the transaction. The account of Louis Rix purports to have been opened on September 2, 1936. The expert stated that the Rix account was not made by the same person who made any of the other entries on the same day. Several accounts were opened on February 2, 1936, and the Rix account was not made by the same person who made

the other entries on that date. It was the only account in the book that contained the handwriting of the person who opened the Rix account. All the entries made on February 2, 1936, were written in the same handwriting with the one exception. He determined that the first entries in the book were written on watermarked "Hammermill Bond" ledger paper. Then up to the fore part of 1936, the entries were made on "De Luxe" ledger paper and the use of the latter paper continued to August, 1936. In September, 1936, all the pages were Hammermill Bond with a different watermark. The main difference was that the words "made in U. S. A." were printed in the upper left hand corner. These words did not appear on the old Hammermill paper. The new Hammermill paper with the words "made in U. S. A." did not appear in the ledger prior to February 2, 1936, with the exception of the Rix account. The Rix account was on the new Hammermill paper. From the testimony of the handwriting expert, the master and the chancellor had a right to conclude that the entry of February 2, 1936, covering the "Louis Rix" account was made and inserted in September, 1936, or thereafter. The court had a right to decide that the entry was not made in due course of business, but that it was made for the purpose of supporting the transactions involving the certificates. We are satisfied that the evidence shows that Dr. Mandel was not a purchaser for value in good faith without notice of any facts making the transfer wrongful. Other portions of the testimony of Dr. Mandel are unreasonable. The master saw the witnesses and the record fully justifies his finding that Dr. Mandel was not an innocent purchaser.

The evidence as to the corporate defendant shows that it is engaged in the business of buying and selling securities of the type in evidence; that it purchased similar securities from Dr. Mandel in May, 1936, and that the transaction was satisfactory; that when Dr.

Mandel proposed to sell other securities on September 4, 1936, it had no reason to be suspicious of the transaction, and that accordingly it purchased certificates on that date and delivered its check; that other certificates were delivered on the following day by the messenger of Dr. Mandel, and that it had no reason to be suspicious on that date; that on calling up the depositary it was informed that a stop order had been placed that morning, affecting the transfers of September 4 and 5, 1936, whereupon it stopped payment of the check which had been given to Dr. Mandel on September 4, 1936.

In *McCarthy v. Crawford*, 238 Ill. 38, the court quoted with approval from *McNeil v. Tenth Nat. Bank*, 46 N. Y. 325, as follows:

"It must be conceded that as a general rule, applicable to property other than negotiable security, the vendor or pledgor can convey no greater right or title than he has. But this is a truism predicable of a simple transfer from one party to another where no other element intervenes. It does not interfere with the well established principle that where the true owner holds out another, or allows him to appear, as the owner of or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance." The court said further:

"The law has been generally established that as between the parties the transfer of stock by delivery of the certificate, with power of attorney or endorsed in blank, passes title without transfer on the books of the

company, even when the by-laws of the company provide to the contrary. (*Otis v. Gardner,* 105 Ill. 436; *Rice v. Gilbert,* 173 id. 348.) Such blank transfer on the back of the certificate, to which the holder has affixed his name, is a good assignment and the party to whom it is delivered is authorized to fill it up. It may be filled up with the name of a remote transferee, and the name to be inserted concerns only the purchaser. (*McNeil v. Tenth Nat. Bank,* 46 N. Y. 325; *Johnston v. Laflin,* 103 U. S. 800; *White v. Vermont and Massachusetts Railroad Co.,* 21 How. 575.) The form in which the certificate was issued, the usage and practice indicated thereby as to the method of assignment, the appellee's own act in signing the power of attorney, all correspond with the customary rules with reference to the assignment of similar documents. Though this is not a certificate of stock, it is manifest that it was intended to be assigned in the same manner, and no reason is seen why it may not be so done and with the same effect.

"By signing the transfer and power of attorney in blank, from whatever motive, and delivering the certificate so endorsed to Whipple & Co., the appellee clothed them with the customary indicia of absolute ownership. He had done all that was necessary for him to do,—all that was possible for him to do to indicate to all persons interested that they owned the certificate. With the transfer on the books of the company he had nothing to do. It did not concern him. Its object was the protection and convenience of the assignee or the receivers. Appellee by this positive act enabled Whipple & Co. to deceive appellant, as they could not otherwise have done, to induce him to believe they were the owners of the stock and to sell the stock to him. The certificate not being negotiable paper was subject in the hands of appellant to all the equities existing against the certificate itself,—to all equities against the original holder or in favor of the

maker; but appellee could set up no equities against appellant, because by his writing he had estopped himself from claiming that Whipple & Co. were not his assignees for value.''

We are of the opinion that Goven, Eddins & Company received the certificates for value in good faith without notice of any facts making the transfer wrongful. Having so decided, it is not necessary for us to pass on the matter of custom. An examination of the record, however, convinces us that the manifest weight of the evidence is that under the circumstances disclosed, there was no custom requiring defendant corporation to inquire as to previous transactions. The officer of the company had known Dr. Mandel for 14 years and the corporation had had a satisfactory transaction of the same kind three months previous.

For the reasons stated, the decree of the superior court of Cook county is reversed and the cause remanded with directions that a decree be entered adjudicating Goven, Eddins & Company, a corporation, to be the owner of all the securities offered in evidence and described in its counterclaim, directing the Chicago Title & Trust Company, as depositary, and the Chicago City Bank & Trust Company, as trustee, to transfer title to said securities to Goven, Eddins & Company, and directing that the purchase price (now in possession of Goven, Eddins & Company) for the three securities delivered on September 5, 1936, be delivered to plaintiffs according to their interest, and that the court enter a judgment in favor of plaintiffs, according to their interest, and against defendant Dr. Julius I. Mandel in the sum of $644.94 and costs.

*Reversed and remanded with directions.*

DENIS E. SULLIVAN, P. J., and HEBEL, J., concur.

### ON REHEARING.

On rehearing, the last paragraph of the opinion heretofore filed is modified so as to read as follows: For

the reasons stated, the decree of the superior court of Cook county is reversed and the cause remanded with directions that a decree be entered adjudicating Goven, Eddins & Company, a corporation, to be the owner of all the securities offered in evidence and described in its counterclaim, directing the Chicago Title & Trust Company, as depositary, and the Chicago City Bank & Trust Company, as trustee, to transfer title to said securities to Goven, Eddins & Company, and directing that the purchase price (now in possession of Goven, Eddins & Company) for the three securities delivered on September 5, 1936, to be delivered to plaintiffs according to their interests, and that the court find that a tort was committed by defendant Dr. Julius I. Mandel, and that malice is the gist of the action against Dr. Julius I. Mandel, and that the court enter a judgment in tort in favor of plaintiffs, according to their interests and against defendant Dr. Julius I. Mandel for the sum of $644.94 and costs.

*Reversed and remanded with directions.*

Denis E. Sullivan, P. J., and Hebel, J., concur.